Mr. Sprouse, are you present? Yes. Can you come forward? We just had a couple of questions. We wanted to clarify a matter. I could ask the clerk to come forward and please hand this to Mr. Sprouse. Mr. Sprouse, I hope you don't mind. I'm sorry to inconvenience you in coming here today. But we had a confusing matter here, and I was hoping you could help clarify it for us. I just had the clerk hand you the acknowledgement of hearing a notice that was submitted to this court.  Yes. Okay. It's the acknowledgement of hearing notice for this particular case, Zarco-Romero v. Holder. And Mr. Zarco-Romero was your client previously, is that correct? Right. And I'm just we're trying to figure out who submitted this acknowledgement of hearing notice. Is that your That's my childish scrawl on the bottom there. All right. Yeah, I was ceding time to Amicus Council if I was that was the idea. I was going to cede the time so the party to argue was Amicus Council. And then I had discussions with the clerk, and I thought that was clear that I was going to cede my time. Well, I guess it's the understanding here, at least in this court and the clerk's office, that whoever submits this acknowledgement of hearing notice is who's going to appear. I mean, that's, I guess, been the clear understanding with respect to acknowledgement of hearing. And what's not clear is, did you consult with Ms. Schertman before you committed her to be here? Sort of emailing and faxing. I sent her a letter at one point that I would happily concede the time, and I sent an acknowledgement stating that you could have the You sent an acknowledgement to Ms. Schertman because she's not, she was not aware of this or any communication by you that committing her to be here. And so that was just a little disconcerting to the court. That's not my intent in any way, shape, or form. Did you say you had talked to someone in the clerk's office about this? Yeah, I spoke with someone just the other day, and there was an order confirming that I was going to be here and Amicus was going to argue. I mean, you know, I've argued many times before the Ninth Circuit. I have no compunction about doing it. I thought of sort of being courteous to Amicus, so I apologize for any confusion. It is when you confer with them and let them know that you're committing them to be here because that's what you're doing when you submit this. It's a problem when there is no communication or you're signing saying someone else is going to be here. So any time you bind someone else to be here and there's been no communication, which is our understanding, that's a problem and it's viewed with disfavor. And so, again, let me just ask, did you and when did you communicate with Ms. Shurtman prior to signing this? I have a letter that was shortly after that saying, I don't have it here. I was never under the impression. Did you do it before you committed her to being here? I don't recall. I think I did it sort of roughly simultaneous. Okay. Yeah, I received it. I know I have the letter somewhere. I said I received it and I told the Court I would, you know, you could have the full time. It was not, I could root through my stuff. I have, I know it was roughly, I think it was the same. By a phone call, through an e-mail? Yeah. Which, which? A letter. A letter. So you have a copy of the letter. I could send it to the Court. Okay. That would be great. I was mystified that I was trying to do anything except be courteous. Well, I guess they were surprised to see that there had been acknowledgement of hearing noticed, committing them and they had not signed it and there had been no communication, and that's understandable. And so we wanted to make sure, especially for you, sir, that you understood that that's, it seems like you would know that by now, that by the time you signed this, that you're committing whoever's listed here to be here and if it's not you then you need to communicate with them. I thought I did. I did. I was under an understanding. And then I didn't receive any response. I figured if you were amicus, I would be happy to do so. And I know there was some disputatious e-mail earlier, but, I mean, I was not trying to do anything except, again, cede my time to amicus counsel. So if you could send that letter to Peter Shaw, that would be great. Okay? A copy of that letter. I mean, I apologize if there was any miscommunication or inconvenience. That was not my intention in any way, shape, or form. Thank you. Ms. Sherman, if you could just come forward. Did you, I guess I just want to clarify for the record, did you get any communication from Mr. Sprowls? We exchanged a couple of e-mails, Your Honor. As I recall, in one of those e-mails, Mr. Sprowls said that unless he heard from me, otherwise, he would assume that we would be arguing the case. He did not hear from me otherwise. Therefore, we were rather taken aback. When you saw this acknowledgment. Exactly. And I can understand Mr. Sprowls's explanation that there may have been some confusion. I have no doubt he operated under the best of intent, but that's not the way I understood his communication. I understood it as exactly what it said, or as I recall what it said, which was simply that unless he heard from us otherwise, he would assume that we were arguing the case. And did you know when the case was scheduled for argument? Yes, I did. And how did you find that out? Because we also received a notice, an acknowledgment, and that was the date that was given, and so we had assumed that we would be splitting the time. And when did you see this acknowledgment form? From Mr. Sprowls. Or how did you see it? I don't know how you. It was posted on the docket. We got notice from the ECF service. And you knew what the date was, and you knew you were going to be arguing, right? Yes, Your Honor. Did you ever send back an acknowledgment? I did. What I did, Your Honor, was when I saw the acknowledgment that Mr. Sprowls filed, and I was taken aback because I had not authorized him to file that acknowledgment, I immediately communicated with the court at the request of the clerk. I submitted a letter explaining that I had not authorized Mr. Sprowls to speak for me, and then I submitted my own acknowledgment notice that we would be arguing. I didn't assume that we were going to be the only ones arguing. Did you ever get a letter? Do you remember getting a letter? I don't know if it was in the form of a letter or an e-mail, Your Honor. I don't recall which one it was. But what I did receive, as I said, was that Mr. Sprowls would assume that we would argue unless he heard from me otherwise, and he did not hear from me otherwise. Who is the we would argue? I'm sorry. We being the University of Idaho College of Law Legal Aid Clinic, the students working under my supervision. I see. So, in other words, he made an assumption. I did not respond to that assumption because the nature of the communications back and forth were fairly contentious at that point, and I did not want to in any way assert that we didn't want him to argue. We decided that that was his business, and so I didn't respond. I only responded once I saw the notice that he filed on my behalf, I guess. That's the way I understood it, and then I immediately communicated with the court. All right. Well, I think I'll refer this matter to the appellate commissioner, Peter Shaw, and Mr. Sprowls, I'll direct you within the next five days to submit that letter that you said you sent to Ms. Shertman, informing her that you had committed her to be here, and then the follow-up. Is there anything else? Well, if you have any e-mails that you think should be looked at also, send those as well. That's all I have. Thank you. Thank you. Thank you. All right. Now to the merits. May it please the Court. My name is John Anderson, along with Catherine Piazza, and under the supervision of Monica Shertman of the University of Idaho Legal Aid Clinic, this Court has appointed us amicus curiae on behalf of the petitioner Manuel Zarco Romero. With the Court's permission, we would reserve one minute for rebuttal, and we would split the balance of our time roughly equally between us. Your Honors, Mr. Zarco's motion to reopen is one where the agency has not considered new evidence of medical and educational hardship presented by experts. Mr. Zarco would respectfully ask that this Court remand his case to the BIA with instructions that it reopen so that he may pursue his claim, or an alternative that this Court remand his case to the BIA so that it may consider his motion under the proper legal standards for three reasons. First, the BIA abuses discretion in denying Mr. Zarco's motion to reopen. Second, this Court does have jurisdiction to hear this petition on all the questions. And third, the agency erred in its determination of credibility when deciding on the continuous presence question. Ms. Piazza will present on our third point, and I will present on our first two. As for our first point, this Court has jurisdiction for two reasons. First, the BIA considered the continuous presence question in denying Mr. Zarco's motion to reopen. And second, the BIA then relied on its analysis in determining its denial. This Court has held in a BB v. Gonzales and RSD v. Holder that the BIA does not have to consider questions which are procedurally defective. However, once it does so, it brings its analyses within the purview of this Court. And that's exactly what's happened here. Mr. Zarco has presented a motion to reopen on hardship. When the BIA considered the motion on hardship, it then based its denial on its analysis of the continuous presence issue.  So as to our second point, the BIA should have granted Mr. Zarco's motion to reopen because he had presented new and material evidence on ---- How is the hardship issue before us? Because the BIA, did they weigh in on the hardship issue? I don't think they did. Ma'am, they did not. And don't they have to before we can look at it? Well, Your Honor, with respect to the abuse of discretion in not considering the hardship, that matter would be before the Court. And that's all that we'd ask this Court to consider. Okay. Yes, ma'am. And we do believe that the BIA abused its discretion on the hardship matter because he presented new and material evidence of medical and educational hardship to his citizen children, which presented a prima facie case that, in fact, he had met the hardship element. Matter of Racinas and matter of Montreal make plain that evidence of medical and educational hardship would present a strong case if it were to affect the citizen's children. But they decided this on the lack of continual presence issue. Yes, ma'am, they did. Okay. I know procedurally this is a very ---- this was unique because the IJ initially, I guess, or, you know, below, decided that the ---- didn't need to look or I guess they reviewed hardship, but the issues that are present now were not present then. Is that correct? Yes, Your Honor. And then focused on the, I guess, the continual or lack of continual presence for 10 years. Is that correct? Yes, Your Honor. All right. And then this went to the BIA and they ---- I'm sorry. I thought you were speaking to the BIA, Your Honor. The IJ ruled on all questions below. Mr. Sproul's presented to the BIA on direct appeal. On direct appeal, the BIA denied on hardship. And then Mr. Sproul's motion to reopen on the hardship question. So the BIA had not at that point considered the continuous presence question. When Mr. Sproul's presented on hardship, the BIA then considered the continuous presence question. Right. And so as Ms. Piazza will explain, we think that the agency erred in their determination of the credibility question. And so that would place all of these before the court. And did Mr. Zarco-Romero preserve that issue, the credibility issue, for appeal in his initial appeal to the BIA? Yes, Your Honor. On the physical presence issue? On all questions before the BIA with respect to his direct appeal, all issues were preserved. And then when the BIA denied ---- Including the credibility determination? My understanding, Your Honor, at direct appeal. When the BIA denied on the ---- on hardship grounds, he then pursued with a motion to reopen. And so what we believe brings all the issues before this Court, as is the teaching of R.S.D.B. Holder and Abibi V. Gonzales, is that the agency in deciding that it would consider continuous presence than places its analyses of that question before this Court. Well, aren't we limited by Mendez Gutierrez? It seems like even if the BIA had decided that the new evidence was not sufficient, wouldn't we be precluded to review the initial hardship determination by Fernandez? Your Honor, as a matter of evidence or a matter of discretion, Fernandez would preclude. However, this Court has repeatedly held, and in fact in Fernandez, that if what was presented was a new and different kind of evidence, which is the case here because both of Mr. Sartico's children were, as the IJ notes and the BIA notes, healthy when presented, then this Court does retain the jurisdiction to review whether or not the agency abuses discretion in denying the motion to reopen. And so that, combined with the BIA having considered the continuous presence issue and having relied on its analyses in order to deny the motion, places all the issues within this Court. And so we're asking the Court to look at the motion to reopen on hardship from the abuse of discretion standard. Go ahead. Did you have another question, Your Honor? And as a matter of racine, as a matter of monoreal make plain, this Court, the medical evidence would present a strong case for presenting for hardship. And so had the BIA aggregated with the prior evidence that was there, we think that no reasonable fact finder would have concluded otherwise. And with the Court's permission, Ms. Piazza would present our third point. Thank you, counsel. Let me just say one thing. You presented a good argument, but I want to mention one point, which is we don't call judges ma'am, which you did the first three times. You then upgraded ma'am to Your Honor. Yes, Your Honor. Thank you very kindly. Thank you. It's not a serious problem, but I just want to tell you that so you don't do it later. Thank you, Your Honor. Okay. May it please the Court. My name is Catherine Piazza. Substantial evidence does not support the I.J.'s adverse credibility determination. First, the I.J.'s adverse credibility determination lacked cogency as required by cases such as Lee v. Holder. Lee v. Holder states that an adverse credibility determination must be based upon a specific cogent reason. Here, the I.J. first stated in the record on page 62 that the declaration should be given diminished rate. However, she then goes on to state that the adverse credibility determination is based upon two of the declarations and the inconsistencies between them and that of Mr. Zarco's testimony. Therefore, by initially stating that the statement should be given diminished rate but then going on to base her adverse credibility determination on those lacks cogency. Second, the I.J.'s adverse credibility determination was not based upon material inconsistencies as required by cases such as Powell v. INS. Here, the I.J.'s adverse credibility determination was based upon two minor inconsistencies that did not go to the heart of the claim. The first inconsistency was between Mr. Zarco's testimony and that of Mr. Cook's. The inconsistency was with regard to 1989. Mr. Zarco stated that he worked for Mr. Cook for three months, and Mr. Cook stated that he worked for him for three days. Here, this does not go to the heart of the claim. This does not go to the heart of the claim because, first, the determinative date here is October 11, 1990. Therefore, any inconsistency regarding 1989 is not directly relevant to the heart of the claim. The second inconsistency is in regard to Mrs. Castellano's statement. Here, the inconsistency is that he met her in 19 — she stated that he met her in 1991. However, he stated that he met her in 1989. He then goes on to explain this inconsistency, which the I.J. failed to address. He explained this inconsistency by stating that he met her in 1989 but did not move in with her until 1991. This is not directly relevant to the heart of the claim because this still establishes that he was still in the United States in 1991. And it does not — and she never — she failed to address the explanation that Mr. Zarco gave. Therefore, it is minor and does not go to the heart of the claim and does not support the adverse credibility determination. Third, the I.J. erred when making her credibility finding because she failed to review all relevant evidence. She failed to review — Didn't Mrs. Castellano and then Mr. Cook say Mr. Romero had worked for him for three days instead of three months? That was Mr. Cook's declaration, Your Honor. Okay. And why wasn't — I mean, what — that's a pretty significant discrepancy, isn't it? No, Your Honor. It's not. The determinative date here that he must establish continuous presence is October 11, 1990. Therefore, any inconsistency regarding 1989 is not directly relevant to this claim. Furthermore, the fact that he worked for three months or three days does not matter. He was here in 1989. I see that I'm out of time. Can I continue? I'm sorry. Go ahead and answer my question. When you say he'd been here since 1990, what was the proof of that? Weren't those general affidavits? There was — there were declarations that he submitted as well as his testimony that he was here beginning in 1989. The declarations that established that he was here in 1990 was Mr. Estrada's declaration on AR-314, Mr. Magna's declaration on AR-313, Felix Mata's declaration on AR-492. Weren't they all pretty general in nature, these affidavits? They specifically stated that he met him in 1989, worked at the vineyards, that there was a long-term friendship. I wouldn't say they were general. They were specific with the dates and specific why they knew him. And only Mr. Zarco Romero testified at his hearing, is that correct? That's correct, Your Honor. And the I.J. found him not credible. What do we do with that? Here, the I.J. must base her adverse credibility determination on a specific cogent reason. The I.J. erred because she didn't base her adverse credibility determination on a specific cogent reason. She based them on two minor inconsistencies that didn't go to the heart of the claim. And therefore, she erred by determining that he was not credible. Under the precedent, I would argue a reasonable fact finder would find otherwise under the credibility precedent and under the documentary evidence that she failed to review. Thank you. In conclusion, we'd – may I conclude, Your Honor? Please. In conclusion, we would ask this Court to remand the case to the BIA with instructions to reopen so that Mr. Zarco can proceed with his claim for cancellation of removal, or in the alternative, remand the case to the BIA with instructions to hear his motion under the correct legal standards. Thank you, counsel. Good morning. May it please the Court, Sharon Clay for the government. It is our contention that the Board did not act arbitrarily, irrationally, or contrary to law when it denied Mr. Zarco's motion to reopen, based on his failure to present a prima facie eligibility for relief. Mr. Zarco had the burden of demonstrating 10 years of continuous physical presence, but he appeared before the immigration judge and was unable to provide a credible account of his presence in the United States. His alleged presence was contradicted specifically by Mr. Cook's sworn statement and – well, not sworn – and Ms. Sylvia Castellano's sworn statement. Based on these two inconsistencies, which do, in fact, go to the heart of the claim, and his presence in the United States at a minimum from October 1992 to 2000, the immigration judge properly determined that he was adversely credible. Based on this adverse credibility finding – How did they go to the heart of the claim? You just heard from your colleagues over here that they didn't. How did they go to the heart of the claim? He had to establish his presence from October 1990 to October 2000. During this October 1990 to 2000 window, Ms. Sylvia Castellano is charged by Mr. Zarco as having provided him residence from that period of time. And based on her testimony or her sworn statement that she did not meet him until 1991, her statement does not allow for us to determine that he was actually residing in the United States during that period of time, that first year, 1990 to 1991. No reasonable fact finder would be compelled to conclude that he actually resided in the United States based on the evidence that's actually been presented. Based on the immigration judge's adverse credibility finding, which is supported by substantial evidence, there's other evidence in the record that tends to prove that he may not have been present in the United States. The immigration judge – To prove he may not have been, what does that mean? That he may not have been? Yes.  If it proves he may not have been, that means he may have been. Well, the asylum application, which he signed and executed under penalty of perjury, actually shows his presence outside the United States from 1990 to 1991 in the military, the Mexican military. So that directly contradicts his claim that he was in the United States in 1990, which substantially supports the immigration judge's adverse credibility finding based on the contradiction between his alleged presence and Ms. Castellano's denial of meeting him until 1991. So he signed this affidavit basically saying he was in the Mexican military? Yes, from 1990 to 1991. I remember seeing that. And then that would have been – that would have cost him that full year. Correct. Potentially. There's other evidence in the record that – Potentially. Potentially? You mean it may or it may not, again? Well, if he can't be in the United States and be in the Mexican military at the same time. I just wondered why it was only potentially. Well, no, he wasn't in the United States. Based on the evidence, he was not in the United States in 1990, which is the burden he was required to establish to get the continuous physical presence for 10 years. There's also the contradiction between his addresses, between the two applications. His cancellation of removal application as well as his asylum application have inconsistencies on his places of residence. And both applications were completed within three months of each other. Now, although I understand he accounts for lack of information or inconsistencies based on his vagaries of memory, but when you're completing two separate applications within three months of each other and they have differing information, you have to wonder how much vagaries of memory have to play into his inconsistencies. He was a migrant worker, right? Yes. He was moving around. And that means he could move back to Mexico. It doesn't mean he has to move around within the United States. And because the immigration judge's adverse credibility finding was supported by substantial evidence, the immigration judge rightfully required objective evidence in the record to rehabilitate his claim. These chairs are terrible. And actually the amicus in their brief had actually mentioned that the immigration judge sort of relied on this lack of objective evidence in the record to dispel his claim, but that, Your Honor, is not true. That, Your Honors, is not true. Actually, the lack of objective evidence only became fatal because he adversely testified to his presence in the United States. Had he testified credibly, even the general information that was provided by some of the other declarants in the case could have potentially have secured or supported his continuous physical presence. The mere fact that he was unable to testify credibly about his own presence brought questions to all the other evidence that was placed in the record. And because of the generality of the declarations that were in the record, there's no way for the immigration judge to conclude that he was continuously present during that time, especially given the contradictions that are in the record. Is there any evidence as to when he actually did arrive in the United States? All we have is the declaration from Mr. Cook and Mr. Zarco Romero, as far as I can tell. The NTA was issued based on an illegal reentry in 1998, and at the time during the hearing he told the court at the time that he had first came to the United States in 1989. Well, I guess wasn't the IJ supposed to consider the fact that Mr. Zarco Romero was new to the country, unstable as a migrant, working, going back and forth between Los Angeles and also this was ten years before? And I guess because the main case that is cited by Mr. Zarco Romero is Vera Viegas, which basically is submitted saying that it was error for the IJ to consider all of that. What's your response? My response to that is this case is distinguishable from Vera Viegas. In Vera Viegas there was no finding of adverse credibility at all. The petitioner testified credibly about his account. Unlike the petitioner here in this case, the petitioner in Vera Viegas was actually homeless. There were people that substantiated his claim of homelessness. Mr. Zarco Romero has not claimed once that he has never had a place to stay. In preparing for this particular case, even if he couldn't remember the address where Silvia Castellano lived, he could have asked her to verify where that address is. So it's not that that evidence doesn't exist. I guess that's my question. Mr. Zarco Romero did provide some addresses. If we find that it was error for the IJ to discredit his testimony on the basis of vagueness about his address, can we still find substantial evidence to support the IJ's determination here? Yes. His sworn executed testimony under his asylum application stating that he was not inside the United States from 1990 to 1991. And the declaration that was submitted... Did he ever explain that? Why? I mean, did anybody ever ask him about it? It seems to me like that would be a big issue. Somebody would have examined him or... Nobody asked him specifically about it, but it substantiates the IJ's adverse credibility findings. The IJ had that. It had the information in the record. So when he's testifying, the IJ never... I mean, I just can't imagine, I guess as a trial judge, I can't imagine if I had somebody testifying that I was here in 1990, and then I had something that showed that the person wasn't. I wouldn't ask him about it. Yes. However, the information as, like I said, as presented in this particular case, 1990 was an important part of the 10-year consent... But what Judge Ezra is saying is that, yes, it's important. That's the reason that you ask about inconsistencies. Right. But that's what substantiates the adverse credibility findings. What do you mean right? Isn't that the rule that we have in the circuit? You're supposed to ask about inconsistencies? Oh, the inconsistencies. He was asked about the inconsistency, and he said that the two people who submitted diswarrant statements were wrong. No, no, I'm talking about his statement. They asked him about his presence. No, no, no. He's got this declaration that he had filed when he came back in, right, that said he was in Mexico. Right. No, they didn't ask him specifically about Mexico. But I can't fathom that. You can't fathom that he... Why wouldn't they ask him? I mean, it's the critical piece of evidence. It is critical, but based on the number of cases that they probably see every day, maybe they just overlooked it. But the fact of the matter is, is that the... No, he was not questioned about inconsistencies, despite the fact that that's the rule in the circuit. No, he was asked about the inconsistency. Not with the Mexican... No, he didn't. No, he wasn't asked about that particular one. But the inconsistency with Sylvia Castellano's sworn statement is sufficient to support an adverse credibility finding. Once that determination was made, the I.J. was... It was okay for the I.J. to look for objective evidence to determine whether or not he was actually here. Now, if you look at the declarations that are in the record, the I.J. did look at them and didn't reject them, but they're not sufficient to establish the continuous physical presence because they were so general. So it's not that they're rejected. But they would have been had he been credible. But they could have been had he been credible. One of the other things I mean, there's a lot of things in this case that apparently got missed below. But the case is riddled with inconsistencies, including his statement that he entered the United States in 1989 with his wife, but he's got a son born in 1990. There's no explanation as to where did the mother with the small baby reside in 1990 if she wasn't living with Sylvia Castellano. And we're talking about a new infant. He's never alleged that they moved around from house to house. There was no established place of residence. And the place that he claims he resided says, I didn't know you. Was this mentioned in the I.J., the BIA's report or your briefs? No. This is just evidence in the record that supports the adverse credibility finding. Thank you very much. I had just one quick question. Was it proper for the BIA to reach this physical presence issue in the initial appeal? And then, I mean, I guess it didn't raise it in the initial appeal, but then now raises it in the motion to reopen. I mean, procedurally, this case is kind of ---- It does seem strange, but each decision is distinct. One has no bearing on the other. In this motion to reopen, Mr. Zarco was charged with establishing prima facie eligibility for relief. To establish prima facie eligibility for relief, he had to establish 10 years' continuous physical presence, moral character, no crimes, and extremely unusual hardship. That said, the factual analysis of determination about his continuous physical presence was already established. They didn't have to go back and redo that over again. So they looked back to the I.J.'s determination that he did not continuously reside in the United States and said that that immigration judge's determination was not clearly erroneous. Thank you, counsel. That said, the record does not compel the conclusion that Mr. Zarco has met his burden of establishing 10 years' continuous physical presence. The contradictions in his record and the lack of objective evidence supported the immigration judge's and the board's conclusion. Thank you again, counsel. I'd like to make two points. First, in regard to the military question, whether he was here or not, the agency never or the government below never raised this issue, and so they can't do that at this point. And it doesn't – Well, just wait. Stop. If it was in front of the I.J. Correct. Right? Yes. And they considered it. They never asked him about this question. It doesn't matter whether – Direct AR 280. I would agree with you that they should have asked him about it. But if it was submitted as evidence and it was considered by them, they don't necessarily have to ask him about it. They don't have to ask him about it, but the – and that's exactly my point. The I.J. asked him how many times he departed. He said three times. The I.J. only questioned him on two times. Therefore, the I.J. never based her credibility determination on this factor, and it's not directly relevant to the claim. Second, the I.J. never addressed the plausible explanations that Mr. Zarco had with Mrs. Castellanos, the inconsistency regarding Mrs. Castellanos' statement, and required by precedent she had to make an adverse credibility determination, she should have addressed the plausible explanation that he met her in 1989 but did not move in with her until 1991 when he – when she got sick. And third, the place of residence when he moved back and forth is not a specific cogent reason to base her adverse credibility determination. Thank you. But it's from the other way. I mean, if she said she never met him, then how could he have moved in with her? Your Honor, he said – she stated in her declaration that he met her in – he met – he – or she met him in 1991. Excuse me. And then he stated that he moved in with her in 1991 but actually met her in 1989. Okay. Thank you, counsel. The case is argued will be submitted.
judges: Ezra, Reinhardt, Murguia